794 F.2d 1373
 1 Indiv.Empl.Rts.Cas. 753
 Donald W. HEWITT, M.D., Plaintiff-Appellant,
v.
Peter GRABICKI, M.D., Jane Doe Grabicki; Paul H. Guilfoil,
M.D., Jane Doe Guilfoil; Daniel Myhre, Medical Assistant,
Jane Doe Myhre; Harry N. Walters, Administrator of Veterans
Affairs, Veterans Administration; and the United States of
America, Defendants-Appellees.
 No. 84-4415.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 10, 1985.
Decided July 18, 1986.
 
 Lawrence Cary Smith, The Smith Law Firm, Spokane, Wash., for plaintiff-appellant.
 Carroll D. Gray, Asst. U.S. Atty., Spokane, Wash., for defendants-appellees.
 On Appeal From the United States District Court for the Eastern District of Washington.
 Before REINHARDT, BEEZER and HALL, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 A former Veterans Administration physician brings an action against the Administrator of Veterans Affairs[1] and the United States seeking an order to the agency to delete unfavorable statements from annual proficiency reports and to recover damages for harm allegedly caused by those statements. He sues three Veterans Administration hospital employees for violating his civil and constitutional rights, alleging a conspiracy to force his resignation. He brings additional pendent state tort law claims against the individual defendants. The district court granted the defendants' motion for summary judgment and the plaintiff appeals. We affirm.
 
 BACKGROUND
 
 2
 Dr. Donald W. Hewitt was employed as staff urologist of the surgical service at the Veterans Administration Medical Center in Spokane, Washington. Dr. Hewitt alleges that Dr. Peter Grabicki, chief of surgical services, Dr. Paul H. Guilfoil, chief of staff (now deceased), and Daniel Myhre, a physician's assistant, engaged in a campaign against him by making false and derogatory comments concerning his medical performance, both in oral conversations and written reports, with the aim of forcing him from employment with the hospital.
 
 
 3
 In December of 1978, Dr. Grabicki, as Dr. Hewitt's supervisor, completed a proficiency report evaluating Dr. Hewitt's performance for the previous year. Although Dr. Hewitt was assigned an overall satisfactory rating, Dr. Grabicki attached additional comments stating that a number of incidents had occurred which required counseling of Dr. Hewitt. Those alleged incidents included scheduling at least two patients for surgery without proper information in the patients' charts, and failing to "properly manage" two diabetic patients. Dr. Grabicki criticized Dr. Hewitt for maintaining an attitude that he was responsible only for urological problems and need not be concerned with other medical conditions suffered by patients assigned to him.
 
 
 4
 Dr. Hewitt appealed to the Veterans Administration under the Privacy Act of 1974 requesting that the agency amend his proficiency report by deleting the critical comments. This request was ultimately denied by the Administrator for Veterans Affairs.
 
 
 5
 Dr. Grabicki completed another proficiency report in December of 1979, which again gave Dr. Hewitt a satisfactory rating, although with a declining numerical score. The new hospital chief of staff, Dr. Guilfoil, in approving the report, wrote that Dr. Hewitt's performance was deteriorating; that Dr. Grabicki and another urologist had declared they would not allow Dr. Hewitt to operate upon them; that Dr. Hewitt had been careless in completing consent for surgery forms such that patients might not be fully aware of the procedures involved in their consent; and that Dr. Hewitt had told the wife of a patient with inoperable cancer that he could not help him as the Devil had taken over the patient's body. Dr. Guilfoil concluded that Dr. Hewitt should be carefully monitored by Dr. Grabicki.
 
 
 6
 Dr. Hewitt sought no administrative review of the statements in the 1979 report.
 
 
 7
 Dr. Hewitt alleges that the comments attached to these two proficiency reports are merely two pieces of evidence of an ongoing conspiracy against him. He asserts that some of the incidents related in the report were relayed to Drs. Grabicki and Guilfoil by Mr. Myhre, a physician's assistant, who allegedly disliked Dr. Hewitt and distorted what had occurred to place him in a bad light. In addition, he claims that the three individual defendants consistently engaged in derogatory gossip concerning him, as well as unpleasant personal confrontations with him to criticize his performance.
 
 
 8
 Dr. Guilfoil subsequently made the statement that he would do everything in his power to "destroy" Dr. Hewitt unless he agreed to resign. Dr. Guilfoil also stated that in his opinion Dr. Hewitt should not be allowed to perform major surgery and that he intended to make an effort to have his hospital clinical privileges taken from him.
 
 
 9
 Dr. Hewitt additionally alleges that upon commencement of his employment at the hospital in 1967, Dr. Grabicki promised that he would be given unrestricted access to independent consultation and assistance in surgery from non-Veterans Administration physicians. In December of 1979, Dr. Guilfoil issued an order that outside physicians could no longer be used to assist in the performance of surgical procedures, but could only be retained for consultation.
 
 
 10
 In April of 1980, Dr. Hewitt was diagnosed as suffering from a peptic ulcer. He alleges that this ulcer was caused by stress resulting from harassment by the defendants and the pressure from his inability to obtain outside assistance in sophisticated urological surgery. He took sick leave from his duties as of April 30, 1980, and went to Hawaii. In August of 1980, the Veterans Administration requested further information concerning his ability to work. After obtaining this information, Dr. Hewitt was ordered to return to his position at the hospital. He failed to do so and was found absent without pay. A physical standards board subsequently convened to investigate the situation and recommended that Dr. Hewitt either return to work or retire. Dr. Hewitt's attending physicians expressed the opinion that the peptic ulcer was permanent in nature and any future stress could gravely endanger his health. They recommended that he not return to work at the hospital. Dr. Hewitt resigned from the Veterans Administration as of December 28, 1980.
 
 ANALYSIS
 
 11
 * Summary Judgment
 
 
 12
 Dr. Hewitt appeals the district court's grant of summary judgment. See 596 F.Supp. 297 (E.D.Wash.1984). Our review is de novo. Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983). We must determine, after viewing the evidence in the light most favorable to Dr. Hewitt, whether any genuine issue of material fact remains for trial and whether the substantive law was correctly applied. Fed.R.Civ.P. 56(c); Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 981 (9th Cir.1985).
 
 II
 Claims Against the Agency
 A. Privacy Act
 
 13
 Under the Privacy Act of 1974, 5 U.S.C. Sec. 552a (1982), every federal agency is obligated to ensure that information compiled in individuals' records, such as personnel evaluations, is accurate, relevant, timely, and complete. Sec. 552a(e)(5). An individual demonstrating that an agency has failed to meet this obligation may obtain declaratory relief ordering the record to be amended, Secs. 552a(g)(1)(A), (g)(2)(A) & (B), and may recover actual damages resulting from an adverse determination based on such records, Sec. 552a(g)(1)(C), (g)(4)(A) & (B).
 
 
 14
 Dr. Hewitt seeks both to have critical remarks expunged from the 1978 and 1979 proficiency reports evaluating his performance at the Veterans Administration hospital, and to recover damages allegedly resulting from those improper records.
 
 1. Proper Party
 
 15
 The Privacy Act authorizes suit only against an "agency", Sec. 552a(g)(1), as defined in 5 U.S.C. Sec. 552(e) (1982). Dr. Hewitt has not named the Veterans Administration as a specific party to this case, but instead made service upon Max Cleland, in his former capacity as Administrator of Veterans Affairs. At oral argument, the government conceded, however, that Dr. Hewitt would be entitled to amend his complaint to add the Veterans Administration as a defendant, and that this amendment would relate back to the date of the original pleading under Federal Civil Procedure Rule 15(c) as the agency had notice of the action and knew that it was the proper party defendant. As the government has waived any objection based on joinder of parties, we need not decide whether the head of the agency is a proper defendant in a Privacy Act action.[2]
 
 2. Exhaustion of Administrative Remedies
 
 16
 As a prerequisite to bringing an action in district court for an order to amend an agency's individual record under the Privacy Act, Dr. Hewitt must have exhausted administrative remedies in attempting to have improper material in his personnel file eliminated. Sec. 552a(g)(1)(A). Dr. Hewitt properly made every effort to obtain administrative relief with regard to the allegedly objectionable comments included in the 1978 proficiency report. However, Dr. Hewitt failed to initiate any administrative action to obtain relief concerning remarks inserted in the 1979 proficiency report.
 
 
 17
 Dr. Hewitt attempts to justify this absolute failure to seek administrative relief by asserting that no true remedy is available in the Veterans Administration. Dr. Hewitt claims that the Veterans Administration procedures for the proficiency rating system provide administrative appeal remedies only for those individuals who receive an unsatisfactory rating, but not for individuals who are the subject of critical written comments in a report where the overall rating is satisfactory.
 
 
 18
 To the contrary, the agency's proficiency rating system procedures state that approving officials will have responsibility for reviewing, commenting on, and approving reports submitted by rating officials, and personnel officials will have responsibility for administrative review of reports. In fact, Dr. Hewitt was successful in obtaining administrative review, with respect to the 1978 proficiency report, by the personnel officer for the regional office of the Veterans Administration, and ultimately by then Administrator of Veterans Affairs Max Cleland. His request was denied, but the avenue of appeal was afforded him.
 
 
 19
 More importantly, the Privacy Act itself requires each agency that maintains a system of records to permit an individual to request a review of the agency's refusal to amend his record. The agency is required to complete that review and make a final determination within 30 days, unless the head of the agency, for good cause shown, extends that period. Sec. 552a(d)(3).
 
 
 20
 Although Dr. Hewitt did not obtain the relief he desired from the Veterans Administration when he raised objections to comments included in his 1978 proficiency report, he is without excuse in failing to seek administrative review of the contents of the 1979 report. The district court properly dismissed, without prejudice, Dr. Hewitt's action for an order to amend the 1979 proficiency report for failure to exhaust administrative remedies.
 
 3. Declaratory Relief to Amend 1978 Report
 
 21
 The Privacy Act grants a right to declaratory relief through a district court order to an agency to revise or expunge substantive errors in the agency records. Sec. 552a(g)(2)(A) & (B). The primary issue is whether the 1978 proficiency report is accurate in its evaluation of Dr. Hewitt. As this is an appeal from a grant of summary judgment, all facts must be viewed in the light most favorable to Dr. Hewitt.
 
 
 22
 Although the Privacy Act directs the district court to make a de novo determination of requests to amend individual records, Sec. 552a(g)(2)(A), the act does not contemplate that a court will constitute itself as a personnel rating authority to substitute its judgment for the evaluation of performance conducted by a government employee's superiors. Turner v. Department of Army, 447 F.Supp. 1207, 1212-13 (D.D.C.1978), aff'd mem., 593 F.2d 1372 (D.C.Cir.1979).
 
 
 23
 In Turner, an Army Chaplain had initially received an unfavorable officer efficiency rating conducted by his commanding officer. Through Army administrative channels, he had succeeded in having the negative rating removed and replaced by a neutral entry. He brought an action in federal court under the Privacy Act seeking a positive officer efficiency rating. The court refused to perform its own evaluation of the Chaplain, noting:
 
 
 24
 An Officer Efficiency Rating as to the quality of an officer's service is a highly subjective process which requires the opinions and judgments of military professionals.
 
 
 25
 Id. at 1213 (footnote omitted).
 
 
 26
 A court should be very hesitant to second-guess subjective evaluations and observations by an employee's superiors where such matters are within the competence and experience of those superiors. The trial court should, however, carefully review the record to eliminate clear mistakes of fact, inaccurate opinions based solely upon such erroneous facts, and plainly irresponsible judgments of performance or character. See R.R. v. Department of Army, 482 F.Supp. 770, 773-74 (D.D.C.1980). The simplest test is to ask whether the allegation is that the record is inaccurate or instead that the authorized preparer of the record, although basing his judgment on accurate facts, reached the wrong conclusion--whether amendment of the record is sought as to a matter of fact as opposed to expression of a judgment based on reliable facts. Russell, The Effect of the Privacy Act on Correction of Military Records, 79 Mil.L.Rev. 135, 142-45 (1978).
 
 
 27
 Hewitt's complaints are directed to the conclusions and characterizations made in the comments attached to his 1978 proficiency report. Although Dr. Hewitt has vigorously and persuasively challenged the assessment of the various incidents related in the 1978 report, there is no substantial dispute concerning the basic underlying facts. The written comments, while including factual observations, record the incidents as viewed and evaluated by Dr. Grabicki as the rating official. That interpretation of facts is properly consigned to the professional judgment of the agency official.
 
 
 28
 For example, Dr. Grabicki's comments criticized Dr. Hewitt for failing to have "properly managed" two patients with diabetes. The fact that these patients exhibited blood sugar level difficulties is uncontroverted. Whether they were "properly managed" is a matter of professional judgment.
 
 
 29
 Dr. Hewitt has failed to attack with particularity the accuracy of the purely factual incidents related in those comments so as to reveal a genuine dispute of fact. See International Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.1985); Compton v. Ide, 732 F.2d 1429, 1434 (9th Cir.1984). The only factual assertion Dr. Hewitt directly contradicts is the allegation that he told the wife of a patient with an inoperable condition that the devil had taken over the patient's body. Unfortunately for Dr. Hewitt, this assertion is contained in the 1979 report, with regard to which Dr. Hewitt has failed to exhaust administrative remedies.
 
 
 30
 Accordingly, there is no demonstration of a substantial controversy regarding factual assertions or historical fact statements included in the 1978 report and thus no material issue of fact has been established. The inaccuracy of the report not having been demonstrated, the agency is entitled to judgment as a matter of law.
 
 4. Claim for Damages Under Privacy Act
 
 31
 Dr. Hewitt also makes a claim for damages under Sec. 552a(g)(1)(C) of the Privacy Act. Where an agency acted in an "intentional or willful" manner in failing to maintain accurate records, the district court may award actual damages sustained by the individual as a result of an adverse determination based upon such records. Sec. 552a(g)(4)(A) & (B). Exhaustion of administrative remedies is not a precondition to bringing an action for damages under the Privacy Act. Compare Sec. 552a(g)(1)(A) (action for order to amend record permitted when agency review resulted in denial of request or agency refused to review) with Sec. 552a(g)(1)(C) (permits action where agency's failure to maintain proper records results in adverse determination against individual).
 
 
 32
 Having concluded that the 1978 report, at least, was not inaccurate or unfair, there can be no showing that the agency acted in an "intentional or willful" manner in failing to maintain accurate records, which is a prerequisite to governmental liability. See Sec. 552a(g)(4); Doe v. U.S. Civil Service Comm'n, 483 F.Supp. 539, 551 (S.D.N.Y.1980). Dr. Hewitt's claim for damages must therefore be premised upon the 1979 report.
 
 
 33
 However, it is unnecessary to reach the issue of the accuracy of the 1979 report. The Privacy Act requires a causal connection between the allegedly erroneous agency record and an adverse determination made against the individual. Edison v. Department of Army, 672 F.2d 840, 845 (11th Cir.1982). Dr. Hewitt concedes in his brief that there was no adverse determination. The proficiency reports, while critical, resulted in a satisfactory rating. Dr. Hewitt's subsequent resignation from the Veterans Administration involved a dispute concerning his health and ability to return to work, and was not causally related to the contents of the proficiency report.[3] Accordingly, his claim for damages under the Privacy Act must fail.[4]
 
 B. Procedural Due Process
 
 34
 Dr. Hewitt alleges that the Veterans Administration denied him his rights to constitutional due process under the Fifth Amendment by failing to provide him the opportunity for a hearing to present evidence concerning the accuracy of the comments in the proficiency reports. This is essentially a constitutional claim attached to his Privacy Act claim.
 
 
 35
 Procedural due process is governed by a two-step analysis. First, we must determine whether a liberty or property interest exists entitling an individual to due process protections. Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Second, if a constitutionally protected interest is established, a balancing test is to be employed to determine what process is due. Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976).
 
 
 36
 As noted earlier, Dr. Hewitt's resignation from employment with the Veterans Administration was not causally related to the comments included in his proficiency reports. Accordingly, whether a liberty or property interest existed in that employment is irrelevant here. Dr. Hewitt's claim rather must be grounded on an argument that the comments themselves infringe upon some individual liberty interest in having agencies maintain accurate records, or that his opportunity for future employment has been harmed by the unfavorable remarks.
 
 
 37
 Critical comments contained in confidential personnel files, not subject to public disclosure, cannot infringe an individual's liberty interest. Debose v. United States Department of Agriculture, 700 F.2d 1262, 1266 (9th Cir.1983); Ortwein v. Mackey, 511 F.2d 696, 699 (5th Cir.1975). Even if there were disclosure, these criticisms of Dr. Hewitt's performance, not involving charges of dishonesty or immorality, "do not rise to the level necessary to infringe a liberty interest, thereby triggering constitutionally mandated procedural due process protections." See Debose, 700 F.2d at 1266 (charges of substandard performance do not infringe liberty interest).
 
 
 38
 As no constitutionally protected interest has been invaded by the comments in Dr. Hewitt's proficiency reports, Dr. Hewitt's rights with regard to amendment of those records are limited to those provided in the Privacy Act. Privacy Act procedures do not provide an individual the right to a formal hearing, such as that provided pursuant to the Administrative Procedure Act. See Russell, The Effect of the Privacy Act on Correction of Military Records, 79 Mil.L.Rev. 135, 141 (1978).
 
 III
 Claims Against Individual Defendants
 A. Constitutional/Civil Rights Conspiracy
 
 39
 Dr. Hewitt alleges that the three individual defendants who were employed at the Veterans Administration hospital conspired to force him to resign from the hospital. Dr. Hewitt grounds this suit for damages on various civil rights statutes and constitutional amendments, which may or may not support a claim for damages against federal agency officials.[5]
 
 
 40
 Although Dr. Hewitt has failed to make the argument clearly, the gravamen of his complaint appears to be that the harassment he allegedly suffered at the hands of the individual defendants was the primary cause of his peptic ulcer, which in turn destroyed his physical ability to continue his medical duties. The stressful work environment at the hospital, largely caused by the conduct of the defendants, made it likely that his health would be seriously endangered by returning to work. Consequently, he had no choice but to leave his position.[6] In addition, he seeks recovery for permanent physical injury (in the nature of his ulcer) and intangible damages based upon mental suffering and emotional distress and injury to his reputation, all allegedly attributable to a conspiracy by the defendants.
 
 
 41
 However, even federal officials, such as the three individual defendants, who violate constitutional rights enjoy a degree of immunity that may protect them from liability for damages. Capoeman v. Reed, 754 F.2d 1512, 1513 (9th Cir.1985). Public officers require such protection to "shield them from undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). The Supreme Court, in Butz v. Economou, 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978), established qualified immunity as the general rule for executive officials charged with constitutional violations.
 
 
 42
 In Harlow v. Fitzgerald, supra, the Supreme Court rejected the subjective "malicious intention" requirement in favor of an objective test. See also Capoeman v. Reed, 754 F.2d at 1513. The objective test of qualified immunity is set out in Harlow, 457 U.S. at 818, 102 S.Ct. at 2738:
 
 
 43
 We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 44
 The focus is to be on the "objective reasonableness of the official's conduct." Id.
 
 
 45
 The uncontroverted evidence in the record before the district court demonstrates that the Veterans Administration employees named as defendants in this suit acted in an objectively reasonable manner within the outer perimeters of their duties. There were substantial disagreements between the individual defendants and Dr. Hewitt concerning professional medical issues and his performance, and there were perhaps some personality conflicts as well. But there are not facts in the record that would tend to show that any defendant committed any overt act that fell outside of standards of reasonable conduct within his discretionary employment duty to uphold the quality of medical care within the hospital.
 
 
 46
 Were Dr. Hewitt able to establish an overt conspiracy among the defendants to force him from employment without good cause, such conduct would clearly fall outside the boundaries of objectively reasonable conduct. But the mere fact that a conspiracy is alleged is insufficient to defeat an adequately supported motion for summary judgment. Fonda v. Gray, 707 F.2d 435, 438 (9th Cir.1983). Dr. Hewitt has simply failed to produce any probative facts allowing an inference of any conspiracy. The strongest evidence that Dr. Hewitt could provide is Dr. Guilfoil's statement that he would "destroy" Dr. Hewitt. Although this was undoubtedly a poor choice of words, Dr. Guilfoil's full statement makes clear that he believed Dr. Hewitt was no longer competent to practice medicine. In addition, Dr. Guilfoil said he intended to proceed through a professional standards board investigation of Dr. Hewitt. Thus, the statement, even when construed in the light most favorable to Dr. Hewitt, is in no way probative of the contention that Dr. Guilfoil was acting without good cause or that any conspiracy existed.
 
 
 47
 The Supreme Court in defining the qualified immunity standard adopted in Harlow, a case which involved a similar alleged conspiracy to drive a plaintiff from federal employment, expressly concluded that "bare allegations of malice should not suffice to subject government officials" to the costs and burdens of a trial on liability for civil damages. 457 U.S. at 817-18, 102 S.Ct. at 2737-38. The Court held that public policy mandates an application of qualified immunity that would permit insubstantial lawsuits to be quickly terminated. Id. at 813-14, 102 S.Ct. at 2735-36.
 
 
 48
 This is such an insubstantial lawsuit. The record does not disclose any genuine dispute of material fact on the issue of qualified immunity and the individual defendants are entitled to judgment as a matter of law.
 
 B. State Tort Law Claims
 
 49
 Dr. Hewitt has also brought a number of pendent jurisdiction tort claims against the individual defendants based on Washington State common law. We have previously held that federal officials, acting within the outer perimeter of their lines of duty, are absolutely immune from state or common-law tort liability. Augustine v. McDonald, 770 F.2d 1442, 1446 (9th Cir.1985); Miller v. De Laune, 602 F.2d 198, 199-200 (9th Cir.1979).
 
 IV
 Tucker Act Contract Claims
 
 50
 Lastly, Dr. Hewitt seeks damages for the breach of an alleged oral contract made by Dr. Grabicki as agent of the Veterans Administration promising that Dr. Hewitt would be given unrestricted access to independent medical consultation and assistance with urological surgery. The Tucker Act, 28 U.S.C. Sec. 1491 (1982), grants exclusive jurisdiction of contract claims against the government for over $10,000 to the Claims Court.
 
 
 51
 As Dr. Hewitt seeks damages of $500,000 for this alleged breach of an oral contract, exclusive jurisdiction plainly lies in the Claims Court. Dr. Hewitt conceded as much in his brief before this court. The district court properly dismissed Dr. Hewitt's contract claim without prejudice.
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 Harry N. Walters, succeeded Max Cleland as Administrator of Veterans Affairs. Walters has been substituted as party defendant in this action. Fed.R.App.P. 43(c)
 
 
 [2]
 The weight of authority is that the act's authorization of suit only against an "agency" thereby excludes individual officers and government employees. Windsor v. The Tennesean, 719 F.2d 155, 160 (6th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984); Bruce v. United States, 621 F.2d 914, 916 n. 2 (8th Cir.1980); Parks v. Internal Revenue Service, 618 F.2d 677, 684 (10th Cir.1980)
 However, several courts have held that heads of agencies in their official capacity are proper party defendants in Privacy Act cases as such individuals have the final authority in the agency and ultimate responsibility for custody of records. Diamond v. Federal Bureau of Investigation, 532 F.Supp. 216, 219-20 (S.D.N.Y.1981) (construing Privacy Act and Freedom of Information Act, both of which define "agency" according to Sec. 552(e)), aff'd, 707 F.2d 75 (2d Cir.1983), cert. denied, 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); Nemetz v. Department of Treasury, 446 F.Supp. 102, 106 (N.D.Ill.1978).
 The Ninth Circuit has not directly addressed this issue. In Unt v. Aerospace Corp., 765 F.2d 1440, 1447 (9th Cir.1985), this court held that a civil action under the Privacy Act was "specifically limited to actions against agencies of the United States Government." However, the issue before the court was whether a Privacy Act claim could be maintained against a private corporation, as opposed to "governmental entities." Id.
 
 
 [3]
 Dr. Hewitt does allege a tenuous connection between the proficiency report and his eventual resignation, in that he claims the unfavorable comments contributed to the ulcer that rendered him unable to work. Even assuming, as we must on summary judgment, that such a connection exists, his resignation did not constitute an adverse determination based upon personnel records permitting the award of damages under the Privacy Act
 
 
 [4]
 Dr. Hewitt appears to acknowledge the weakness of his claims under the Privacy Act by repeatedly emphasizing in his brief that the comments in the proficiency report have little significance in themselves but are "merely" two pieces of evidence of the campaign against him by other hospital employees. As such, the proficiency reports may be of significance to Dr. Hewitt's claims based on an alleged conspiracy to deprive him of civil rights and constitutional rights, but they cannot support a claim for damages based on the Privacy Act alone
 
 
 [5]
 For example, Dr. Hewitt brought an action under 28 U.S.C. Sec. 1343 (1982), which provides jurisdiction in the district courts for actions commenced to recover damages for deprivation of constitutional rights, yet he failed to specifically identify which civil rights statute provides a right of action applicable to his case. In arguments before this court and the district court, Dr. Hewitt's counsel claimed a right of action under the civil rights provisions of sections 1983, 1985, and 1986. 42 U.S.C. Secs. 1983, 1985, 1986 (1982). Section 1983 is based upon the Fourteenth Amendment and concerns only deprivations of rights that are accomplished under the color of state law, Gillespie v. Civiletti, 629 F.2d 637, 641 (9th Cir.1980), and Dr. Hewitt has failed to allege a racially or class-based animus necessary to establish a civil rights conspiracy under section 1985(2) and (3), id. A cause of action under section 1986 is dependent upon a violation of section 1985. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)
 
 
 [6]
 Apparently, Dr. Hewitt also seeks an order to the Veterans Administration prohibiting it from terminating his employment. Dr. Hewitt had been ordered to return to work and a locally convened physical standards board at the VA hospital found that he was physically able to resume his duties. (Dr. Hewitt's brief refers to a "professional standards board" but the record indicates that entity passes upon the appointment of physicians within the VA and the maintenance of professional competence, while a separate "physical standards board" reviewed Dr. Hewitt's physical ability to perform his medical duties.)
 Dr. Hewitt has not advanced that claim before this court. At any rate, he may not raise it in this action. By resigning from the VA, Dr. Hewitt failed to avail himself of the administrative appeal process provided for under VA regulations as set out in the personnel manual. The local preliminary inquiry by the physical standards board was only the first step in the investigation of Dr. Hewitt's failure to follow the order to return to work. Appeal of such an order may be taken to a disciplinary board in the Office of the Chief Medical Director of the Veterans Administration in Washington, D.C., and ultimately to the Administrator of Veterans Affairs. 38 U.S.C. Sec. 4110 (1982 & Supp. I 1983); see Heany v. United States Veterans Administration, 756 F.2d 1215, 1218-19 (5th Cir.1985) (describing three-stage disciplinary process within VA).