**Robert MARTYR, Plaintiff,**

v.

**Stanley F. MAZUR–HART, Beverly Brylski and Stanley Pachter, Defendants.**

**Civ. No. 90–1086–FR.**

United States District Court,
D. Oregon.

April 13, 1992.

Spencer M. Neal, Ginsburg, Gomez & Neal, Portland, Or., for plaintiff.

Dave Frohnmayer, Atty. Gen., Kendall M. Barnes, Asst. Atty. Gen., Salem, Or., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRYE, Judge:

Plaintiff, Robert Martyr, brings this civil rights action under 42 U.S.C. § 1983 against three staff members of the Oregon State Hospital. Martyr contends that his rights under the First and Fourteenth Amendments to the United States Constitution are violated by the actions of defendants in censoring his outgoing mail. Martyr also brings a pendent state claim. On September 10 and 11, 1991, the claims of Martyr were tried to the court. This opinion constitutes Findings of Fact and Conclusions of Law as required by Fed. R.Civ.P. 52(a).

### FINDINGS OF FACT

Martyr is a patient of and resides in the Oregon State Hospital, which is located in the City of Salem, State of Oregon. He was committed to the custody of the Oregon State Hospital after he was found not guilty of committing certain murders by reason of insanity. Martyr suffers from a paranoid personality disorder or paranoid schizophrenia, or some combination of these two disorders. Martyr has been under the jurisdiction of the Psychiatric Security Review Board of the State of Oregon since 1977. Since he is considered dangerous, he is confined in a high security building and may not leave the grounds of the Oregon State Hospital.

Defendant Stanley F. Mazur–Hart is the superintendent of the Oregon State Hospital. Defendant Dr. Beverly Brylski is a staff psychiatrist at the Oregon State Hospital. Defendant Stanley Pachter is a staff psychologist at the Oregon State Hospital.

Martyr is a prolific letter writer. He refers to his letters as "truth sheets." These "truth sheets" contain written material about people whom Martyr perceives as criminal in nature. The letters of Martyr cover a variety of topics and are ordinarily scathingly critical of someone or something. The majority of the letters that Martyr writes are critical of his treat-

ment and of the staff at the Oregon State Hospital. His letters often contain gross exaggerations or outright lies about his treatment or experiences at the Oregon State Hospital. Martyr calls members of the staff of the Oregon State Hospital such names as sluts, whores, scum, punks and degenerates. In his letters, Martyr does not ordinarily threaten personal violence or advocate violent or illegal activities. His letters are not sent as part of a plan of escape. Martyr sends letters to persons from all parts of the United States. He often writes to people he does not know. Martyr attempts to mail as many as seventy letters each week.

In the spring of 1990, the members of the staff of the Oregon State Hospital began to receive increasing numbers of complaints from the recipients of Martyr's letters. In response to these complaints, and out of concern for the lack of success of Martyr's plan of treatment, the members of the staff of the Oregon State Hospital met to develop a new plan of treatment for Martyr. On April 16, 1990, George Bachik, the former superintendent of the Oregon State Hospital, approved as a part of the new plan of treatment for Martyr a restriction on Martyr's outgoing mail. This restriction was requested by Dr. Alice Shannon, Martyr's former treating physician. Bachik's written approval of the restriction on Martyr's outgoing mail as a part of the new plan of treatment for Martyr provides, in relevant part:

> In accordance with OAR 309–102–005(6)(d), all mail prepared by OSH patient no. 46888 [Martyr] that contains written materials that are detrimental to the treatment of OSH patient no. 46888 are hereby declared a prohibited item. In accordance with OAR 309–102–020, Forensic Psychiatric Program staff are authorized to open all mail of OSH patient no. 46888 in the presence of the patient. All mail shall be inspected daily to determine the presence of a prohibited item. Mail which includes prohibited items shall be confiscated by Forensic Psychiatric Program staff, in accordance with OAR 309–102–015. Once confiscated, these prohibited items shall be han-

> dled in accordance with OAR 309–108–015(6). It is imperative that these procedures outlined in the above cited rules be strictly adhered to by all staff.

> Mail that does not include prohibited items and legal mail are excluded from confiscation.

The new plan of treatment for Martyr provides, in part, as follows:

> Mr M is sending mass mailings into the community that are seen as upsetting and threatening by individuals in the community. This is his method of avoiding treatment to deal with his anger associated with his placement in OSH and his jurisdiction under the PSRB [Psychiatric Security Review Board].

> Patient will be able to deal with anger in the treatment setting (with CM/MD/RN/PHD) not thru [sic] the community upset.

> Pt will be able to discuss with Cm anger and reduce level [of] his agitation in the treatment setting rather then ventilating anger thru [sic] mass mailings daily in one month.

> 1. inspect outgoing mail for fearful and threatening material each day by RN (48C) Staff RN

> ....

> 3. mail that is confiscated OAR 309.-102–015 sub 2, 3, 4, 5, 6, 7 date, name, material, signature of authority, one copy to the patient one copy to the chart. Keep in the drawer and then long term storage.

Exhibit B to Plaintiff's Reply Regarding Renewed Motion for Preliminary Injunction, p. 1 (Addendum to IDT Treatment and Care Plan for Martyr).

On August 1, 1991, this court ruled that Martyr was entitled to a declaration that his mail to government officials is privileged and should be mailed without being opened and entered the following preliminary injunction prohibiting defendants from censoring Martyr's mail in any respect as to the following categories of addressees:

1) any elected public official and his or her staff members, including but not limit-

ed to the governor·of the State of Oregon, state and federal legislators, and district attorneys;

2) any appointed .public official and his or her staff members, including but not limited to state and federal police agencies, risk management offices, and the administrators of the state department of human resources or the state hospital;

3) advocacy groups, including but not limited to the American Civil Liberties Union, the Oregon Advocacy Center, and the Oregon Alliance for the Mentally Ill; and

4) attorneys licensed to practice law in any state. *Martyr v. Bachik,* 770 F.Supp. 1406, 1414 (D.Or.1991).

Stanley Pachter is the staff member designated to review Martyr's outgoing mail. Unless a letter is addressed to persons or entities within one of the categories of mail covered in the preliminary injunction, Pachter opens and reads the letter outside the presence of Martyr to determine whether it should be forwarded to the addressee or confiscated under the provisions of the plan of treatment. When the decision to confiscate a certain piece of mail is made, Martyr is given a receipt for the piece of mail. Martyr is not given a specific reason why a piece of mail is confiscated. However, Pachter is willing to discuss with Martyr why he confiscates any piece of mail. It is Pachter's opinion that Martyr writes letters to reinforce distorted views of what is happening around him and to vindicate his perception of reality. Pachter acknowledges, however, that the confiscation of certain pieces of Martyr's outgoing mail also reinforces his sense of being a victim. Pachter estimates that he confiscates between fifty and sixty percent of Martyr's outgoing mail.

Beverly Brylski believes that Martyr writes letters in order to vent his anger. She hypothesizes that Martyr uses letter writing as a means of ventilating his anger rather than ventilating his anger through discourse and conversation with staff members.

Martyr opposes the confiscation of any piece of his mail. He views the confiscation of any piece of his mail as an act of theft. According to Martyr, the confiscation of his mail increases his anger and distress. His ability to send mail is of great importance to Martyr. Martyr believes that Armageddon will come in 1997, and, at that time, there will be a Judgment Day. Martyr believes that he has an obligation to God to inform the public about the persons he views as criminal. Martyr also believes that he has an obligation to the public to inform them of crimes that are occurring. In some respects, Martyr views his letter writing as the work of God.

## CONCLUSIONS OF LAW

Martyr's confinement in the Oregon State Hospital is analogous to the confinement of a felon in a prison. The Oregon State Hospital, with respect to Martyr, has the same security goals as a prison. The Oregon State Hospital has a rehabilitative goal, just as a prison has a rehabilitative goal. Defendants censor Martyr's outgoing mail in order to further the rehabilitative goal of the Oregon State Hospital. Therefore, the court will borrow from the jurisprudence of prisoner cases in reaching its decision in this case. *See King v. Atiyeh,* 814 F.2d 565, 568 (9th Cir.1987) (relying on prisoner cases for authority in civil rights claim brought by patients at Oregon State Hospital who were involuntarily committed following criminal trials). *But see Youngberg v. Romeo,* 457 U.S. 307, 321–22, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

### *Claim Under O.R.S. 426.385*

Martyr brings a claim for relief under the laws of the State of Oregon alleging that defendants have violated his right to communicate freely under O.R.S. 426.385. O.R.S. 426.385 provides, in part: "(1) Every mentally ill person committed to the [Mental Health and Developmental Disability Services Division] shall have the right to: (a) Communicate freely in person, by sending and receiving sealed mail."

■ The Eleventh Amendment of the United States Constitution deprives a federal court of jurisdiction to order state actors to comply with state law. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* at 106, 104 S.Ct. at 911. Under *Pennhurst,* this court lacks jurisdiction over the claim of Martyr under O.R.S. 426.385. *See Benning v. Board of Regents of Regency Univs.,* 928 F.2d 775, 778 (7th Cir.1991) (*Pennhurst* bars claims for declaratory as well as injunctive relief).

### Federal Constitutional Claims

Martyr also seeks relief under 42 U.S.C. § 1983, which provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

■ In order to prevail on a claim under 42 U.S.C. § 1983, Martyr must demonstrate 1) that the conduct of defendants was under color of the laws of the State of Oregon; and 2) that defendants deprived him of a right secured by the Constitution or laws of the United States. *See Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). Undisputedly, defendants were acting under color of the laws of the State of Oregon. Martyr alleges that defendants have deprived him of rights secured by the First and Fourteenth Amendments to the United States Constitution.

### 1. First Amendment Claim

For the reasons stated in the court's two opinions filed on August 1, 1991, the court finds that Martyr is entitled to a permanent injunction barring the censorship or delay of his mail with respect to the categories of addressees in the preliminary injunction, in addition to newspapers, magazines and other periodicals.

■ Any form of involuntary · confinement, whether incarceration or involuntary commitment, may necessitate restrictions on the right to free speech. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977). Institutional restrictions which implicate the constitutional rights of the criminally insane, including first amendment rights, will generally be upheld if they are reasonably related to the therapeutic interests of the patients or security interests of the institution. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

The United States Supreme Court has articulated a test to be applied for determining the conditions under which the censorship of inmate mail is warranted. *Procunier v. Martinez,* 416 U.S. 396, 414, 94 S.Ct. 1800, 1811–12, 40 L.Ed.2d 224 (1974), *rev'd in part, Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989).[1] That test is:

[C]ensorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment free-

---

**1.** Although the Supreme Court later adopted a different test for censorship of *incoming* mail because of security concerns within a prison, the test for censorship of *outgoing* prisoner mail announced in *Procunier* remains valid. *Thornburgh v. Abbott,* 109 S.Ct. at 1881.

doms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. *Procunier,* 416 U.S. at 413–14, 94 S.Ct. at 1811.

Defendants have demonstrated to the satisfaction of the court that the restriction placed on Martyr's outgoing mail was implemented in order to aid in the treatment of the mental disorder from which Martyr suffers. Treatment of the criminally insane is an important governmental interest unrelated to the suppression of expression. Therefore, part one of the *Martinez* test is satisfied.

■ In applying the second part of the *Martinez* test—whether the restriction placed on Martyr's outgoing mail as modified by this court's permanent injunction is unnecessarily broad or not generally necessary to further the governmental interest— the court must consider three factors: 1) whether the restriction on the outgoing mail is content neutral, *see Bell v. Wolfish,* 441 U.S. 520, 551, 99 S.Ct. 1861, 1880, 60 L.Ed.2d 447 (1979); *Pell v. Procunier,* 417 U.S. 817, 828, 94 S.Ct. 2800, 2807, 41 L.Ed.2d 495 (1974); 2) whether Martyr retains satisfactory alternative methods of exercising his rights under the first amendment, *see Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 131, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977); and 3) whether reasonable alternatives to the restriction are available to defendants for use in rehabilitation, *see Block v. Rutherford,* 468 U.S. 576, 587, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984).[2]

The restriction on Martyr's outgoing mail under the plan of treatment is, by definition, not "operated in a neutral fashion, without regard to the content of the expression." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. Under his plan of treatment,

as modified by this court's permanent injunction, Martyr's outgoing mail is screened for fearful and threatening material.

Due to his confinement, Martyr may communicate with persons outside the Oregon State Hospital only through written correspondence or by telephone. Although the letters that Martyr writes must be approved by Pachter, Martyr may send letters to categories of addressees covered by the preliminary injunction or letters which do not violate the provisions of his plan of treatment. Therefore, Martyr retains a satisfactory method of exercising his rights under the first amendment. *See Harper v. Wallingford,* 877 F.2d 728, 733 (9th Cir. 1989).

Finally, the court looks to whether there are treatment alternatives to the restriction placed on Martyr's outgoing mail. Defendants treat patients at the Oregon State Hospital through medication, interdisciplinary team meetings, group psychotherapy, and participation in ward activities, among other ways. Martyr refuses, however, to take *any* medications or to participate in *any* interdisciplinary team meetings or group psychotherapy or ward activities. Given this, it is reasonable that defendants would seek other ways to treat Martyr. The purpose of the plan of treatment designed for Martyr is to get him to ventilate his anger in a treatment setting where techniques of anger control can be learned. Martyr, however, has refused to cooperate with the members of the staff of the Oregon State Hospital since the plan of treatment began in the spring of 1990. Since Martyr will not talk about his anger with Pachter or with other members of the staff of the Oregon State Hospital, this court will defer to the judgment of the medical staff of the Oregon State Hospital in its treatment decisions. *See Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462 (decisions by medical professionals are presumptively valid); *cf. Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)

---

**2.** These three factors were set out by the Court in *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2262. A fourth factor analyzed in *Turner*—whether accommodation of a right will have an adverse impact on guards, other inmates, and prison resources—is not implicated here.

(deference to judgment of medical professionals regarding involuntary medication of prisoners).

■ The court finds that restriction on the outgoing mail of Martyr is rationally related to the treatment of Martyr. Although it results in a limitation on the ability of Martyr to communicate with some persons outside of the Oregon State Hospital, the restriction on Martyr's outgoing mail is a significant part of the plan of treatment devised for Martyr. Therefore, the court finds that the practice of restricting the outgoing mail of Martyr under his plan of treatment as modified by this court's permanent injunction is not invalid, and the actions taken by the members of the staff of the Oregon State Hospital pursuant to the plan of treatment devised for Martyr do not violate Martyr's first amendment rights.

2. *Substantive Due Process Claim*

In addition to his claim under the first amendment, Martyr also brings a substantive due process claim. The standard for analyzing the provisions of the plan of treatment which allow for censorship of Martyr's outgoing mail is the same under either a first amendment or substantive due process analysis. *See Washington v. Harper,* 494 U.S. 210, 223, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990) (same standard of review applies "in all cases in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment"). Therefore, the court's holding with respect to the first amendment claim of Martyr is also applicable to the substantive due process claim of Martyr.

3. *Procedural Due Process Claim*

■ "Procedural due process is governed by a two-step analysis." *Hewitt v. Grabicki,* 794 F.2d 1373, 1380 (9th Cir. 1986). First, the court must determine whether a liberty interest exists which entitles Martyr to due process protections. *Id.* "Second, if a constitutionally protected interest is established, a balancing test is to

be employed to determine what process is due." *Id.*

■ "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983). Martyr contends that O.R.S. 426.385 provides him with a liberty interest in a right to send sealed mail. O.R.S. 426.385(1) provides, in part: "Every mentally ill person committed to the [Mental Health and Developmental Disability Services Division] shall have the right to ... [c]ommunicate freely in person, by sending and receiving sealed mail." The word "shall" used in O.R.S. 426.385 is "of an unmistakably mandatory character," *Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871; therefore, the court concludes that the State of Oregon has created a protected liberty interest for all persons committed to the custody of the Mental Health and Developmental Disability Services Division of the State of Oregon in sending sealed mail. *See also Martinez,* 416 U.S. at 418, 94 S.Ct. at 1814 ("[t]he interest of prisoners and their correspondents in uncensored communication by letter ... is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment"); *but see Purnell v. Lord,* 952 F.2d 679, 684 (2d Cir.1992) ("a liberty interest of *inmates* to correspond with non-inmates was not clearly established in [*Martinez* ]") (emphasis in original).

■ The first amendment interest of a person committed to the custody of the Mental Health and Developmental Disability Services Division of the State of Oregon in sending uncensored mail requires "that the decision [of the Mental Health and Developmental Disability Services Division] to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." *Martinez,* 416 U.S. at 417, 94 S.Ct. at 1814. Defendants contend that the grievance procedures set forth in OAR 309–118–020 provide Martyr all of the procedural safeguards to which he is entitled in challenging the censorship of his mail. OAR 309–118–020 provides

four levels of review of patient grievances. The first level is review by the "interdisciplinary team." The interdisciplinary team is the "group of professional and direct care staff which has primary responsibility for the development of a plan for the care, treatment and training of an individual patient or resident." OAR 309–118–005(5). In this case, the interdisciplinary team responsible for Martyr is comprised of the individual defendants. If the decision of the interdisciplinary team is adverse to the patient, he may appeal that decision to a second level, grievance committee. OAR 309–118–020(2)(c). The grievance committee has a minimum of five members, designated by the superintendent of the Oregon State Hospital. OAR 309–118–045(2). Three of the members of the grievance committee are not members of the Mental Health Division of the State of Oregon. *Id.* The grievance committee has twenty-one days to hold a hearing and an additional twenty-one days to render its decision.

Martyr contends that these first two levels of review fail to provide him due process of law because 1) he must appeal any decision to the same persons who made the decision rather to an impartial decision-maker; and 2) the procedure does not result in the reasonably prompt decision to which he is entitled.

Under the procedures employed by the defendants, Martyr receives notice of censorship of a piece of mail shortly after the decision to censor is made. He also receives an explanation for the decision to censor. He can challenge the decision to censor by appealing to the grievance committee, which includes individuals not involved in the decision to censor; however, he must first try to resolve the dispute with the defendants.

Martyr has not utilized the procedures available to him to challenge the seizure of his mail. Martyr testified that, in the past, he had received unsatisfactory results when he filed grievances on other matters. Notwithstanding his dissatisfaction with the results, there is no indication that the procedures which he has failed to use were inadequate. Martyr's failure to employ the procedures available to him constitutes a waiver of his right to bring a federal court challenge to these procedures. *See Correa v. Nampa School Dist.,* 645 F.2d 814, 817 (9th Cir.1981); *see also Knight v. Lombardi,* 952 F.2d 177, 179 (8th Cir.1991) (no due process violation for seizure of inmate's mail without notice when, among other things, inmate "failed to avail himself of available prison procedures"); *Vandiver v. Hardin County Bd. of Educ.,* 925 F.2d 927, 935 (6th Cir.1991) (school board's decision to limit speaking time of student's mother not denial of due process when mother failed to take advantage of time allotted to her to address board); *Pitts v. Board of Educ.,* 869 F.2d 555, 557 (10th Cir.1989) (teacher who fails to use statutory due process procedures waives right to challenge those procedures); *Dusanek v. Hannon,* 677 F.2d 538, 542–43 (7th Cir.) ("The availability of a recourse to a constitutionally sufficient administrative procedure satisfies due process requirements if the complainant merely declines or fails to take advantage of the administrative procedure."), *cert. denied sub nom. Dusanek v. O'Donnell,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982).

## CONCLUSION

The restriction imposed by the plan of treatment on Martyr's outgoing mail as modified by this court's permanent injunction does not abridge his rights under the United States Constitution. Martyr is entitled to a permanent injunction enjoining censorship or delay of his outgoing mail in any respect as to the following categories of addressees:

1) any elected public official and his or her staff members, including but not limited to the governor of the State of Oregon, state and federal legislators, and district attorneys;

2) any appointed public official and his or her staff members, including but not limited to state and federal police agencies, risk management offices, and the administrators of the state department of human resources or the state hospital;

3) advocacy groups, including but not limited to the American Civil Liberties Union, the Oregon Advocacy Center, and the Oregon Alliance for the Mentally Ill;

4) attorneys licensed to practice law in any state; and

5) newspapers, magazines and other periodicals.

On Martyr's state law and procedural due process claims, the court finds for the defendants for the reasons stated above.