**Ronald OLIVE, Plaintiff,**

**v.**

**CITY OF SCOTTSDALE,
et al., Defendants.**

**No. CIV 94–1028 PHX EHC.**

United States District Court,
D. Arizona.

Oct. 2, 1996.

---

**4.** Because the court reaches this result, it need not consider the government's alternative waiver argument.

Michael Rhodes Pruitt, Jackson, White, Gardner & Decker, P.C., Mesa, AZ, Roger William Hall, Phoenix, AZ, for Plaintiff.

Michael D. Moberly, Ryley, Carlock & Applewhite, P.A., Phoenix, AZ, for Defendants.

### ORDER

CARROLL, District Judge.

Pending are Defendants' motions for summary judgment on Plaintiff's state and federal law claims. (Dkt. 48 and 49). Also pending are two motions in limine. These motions are addressed below.

1. Such postings were valid for approximately one year from posting. (Plaintiff's Deposition attached to Dkt. 46 at 24–25).

2. Sergeant Michael Alt, Lieutenant James Dray, and Captain Page Decker, respectively.

### I. *Background*

The Plaintiff is a former City of Scottsdale Police Officer. In the Fall of 1992, after about six and a half years as an officer, Plaintiff took a Sergeant's Examination. As a result of that examination, Plaintiff was ranked fourth in priority on the list of candidates for promotion to sergeant ("Sergeant's List").[1]

Prior to Plaintiff taking that examination, Chief of Police Michael J. Heidingsfield ("Heidingsfield") publicly announced the "Rule of Three" in a videotape shown to officers. (Dkt. 3 at 13). The "Rule of Three" provided that the Chief of Police could select any of the top three candidates from the Sergeant's List for promotion. (Dkt. 3 at 13). Chief Heidingsfield also stated in a departmental videotape that he "could think of no reason" why he would invoke the Rule of Three. (Dkt.14).

After learning the results of the Sergeant's Examination, Plaintiff sent an e-mail message to a female friend, Wendy Hutchison, who was a civilian employee of the Scottsdale Police Department ("Department") stating "Now that I am on the Sergeant's List will you sleep with me?" It is undisputed that Hutchison found the message amusing and was not offended. It is also undisputed that she was the only person to actually see or receive the e-mail.

Hutchison discussed the e-mail with some of her co-workers, including Steve Toubus. Toubus, a civilian Department employee, reported the e-mail to two different superiors. One of these, Sergeant Burl Haenel, notified Internal Affairs of the e-mail. Defendants Sergeant Donald Keenom and Lieutenant Dennis Harrison of Internal Affairs then initiated an investigation for possible sexual harassment and unprofessional conduct.

Plaintiff's supervising Sergeant, Lieutenant, and Captain[2] did not recommend further action as a result of the investigation.[3]

3. Page Decker, Plaintiff's Captain wrote that he thought too much had been made of the incident, but agreed that Plaintiff did not appreciate the importance of his actions or the perception that he had displayed poor judgment and might display poor judgment in the future. (Ex. B to Dkt. 46).

(Ex. B to Dkt. 46). However, Deputy Chief Bartosh concluded that Plaintiff failed:

> to recognize the impact of his actions on others, not just the immediate or intended recipient, and the potential liability to the Dept. Olive exhibits a normal practice of making these types of comments to females. His defense is that the 'jokes' are acceptable because no one told him to stop because they were offended. He lacks any sensitivity to the issue in that his conduct may intimidate the recipient from advising him to stop. The standard for 'unwelcome' should be measured objectively by a reasonable person ... Olive has developed an appreciation of what can constitute inappropriate comments. However, based upon his statements, I am not convinced that he recognizes why such statements are inappropriate or the impact they have on other employees. I recommended a letter of counseling and a mandatory course of instruction on sexual harassment.

(Ex. B to Dkt. 46).

After meeting with Plaintiff, Chief Heidingsfield followed Deputy Chief Bartosh's recommendation by issuing a "letter of counseling" which was placed in Plaintiff's personnel file on December 31, 1992. (Ex. B to Dkt. 50; Olive Deposition). Heidingsfield concluded that the allegation of unprofessional conduct should not be sustained due to the absence of a specific policy prohibiting the personal use of city communications technology. (Ex. B to Dkt. 50). However, Heidingsfield agreed that the sexual harassment allegation should be sustained.[4] (Ex. B to Dkt. 50).

Heidingsfield stated in part that "While this is not the most egregious of such violations by any means, a pattern of potentially offensive behavior clearly exists and demands an administrative response." (Ex. B to Dkt. 50). Heidingsfield noted that Plaintiff had displayed a lack of introspection as to the potential impact of his behavior which negatively reflected on his candidacy for promotion since he would be responsible to insure a workplace free of sexual harassment. (Ex.B to Dkt. 50). Heidingsfield noted that Plaintiff failed to recognize that no matter

> how flippant, humorous or casual he may have intended his comments ... (1) only one recipient need misconstrue them; (2) the cumulative effect may create a subtle, chilling hostile work environment.. and (3) repetition of comments, one-sided comments and repeated requests for dates or sexual intimacy are all litmus test indicators of sexual harassment.

(Ex. B to Dkt. 50). Heidingsfield recommended that a letter of counseling be placed in Plaintiff's personnel file and that Plaintiff receive EEOC training from Human Resources. (Ex. B to Dkt. 50; Ex. B to Dkt. 3). A letter of counseling was placed in Plaintiff's personnel file in January, 1993.[5] It is unclear whether or how it differed from the "Memo to File" prepared by Chief Heidingsfield. (See, Ex. B to Dkt. 50 and Ex. B to Dkt. 3).

Plaintiff alleges that he met with Heidingsfield on January 14, 1993 to discuss the finding of sexual harassment. (Dkt. 3 at 19). Plaintiff alleges that after Heidingsfield advised him that he did not intend to overturn his finding, Plaintiff told Heidingsfield that he wanted to meet with the City Manager,

---

4. The City policy on sexual harassment provided that "conduct creating an intimidating, hostile or offensive work environment. whether intentional or unintentional, that results in harassment of other employees because of their race, color, religion, sex, age, national origin or handicap is illegal and will not be tolerated" and that violations would be subject to disciplinary action, including dismissal. The policy required employees to report instances of harassment and to cooperate in investigation of harassment. The City included examples of behavior which courts had found constituted harassment, including solicitation of sexual favors. (Ex. A to Dkt. 46).

5. Plaintiff alleges that prior to being informed of Chief Heidingsfield's disposition of Bartosh's recommendation, he was advised by Lieutenant Harrison that the likely punishment for a finding of sexual harassment would be suspension and that under the Department's Standard Operating Procedures, a suspension would result in his removal from the Sergeant's List. (Dkt. 3 at 18). Plaintiff alleges that a suspension is appealable under the Department's rules and regulations, but that letters of counseling are not appealable. (Dkt. 3 at 18). Plaintiff does not allege that removal from the Sergeant's List, without more, is appealable under the Department's rules and regulations.

Richard Bowers, to discuss the reprimand. (Dkt. 3 at 19).

Plaintiff alleges that on January 21, 1993, Heidingsfield notified the then-top three officers on the Sergeant's List, Matt Buesing, Plaintiff, and Randy Stringfellow, that he was invoking the Rule of Three and that each of the three would be interviewed. (Dkt. 3 at 19). Plaintiff was interviewed on January 25, 1993. (Dkt. 3 at 20). Buesing was ultimately selected for that promotion, leaving Plaintiff as the first ranked candidate on the Sergeant's List, because the three higher ranked candidates had each been promoted as positions became available. (Dkt. 3 at 20).

On March 12, 1993, Plaintiff was informed that his name had been removed from the Sergeant's List based upon the finding of sexual harassment. (See Ex. D to Dkt. 3; Olive deposition attached to Dkt. 46 at 74, 76, 78–79, 107–111). Due to a change in educational requirements beginning with the following year's sergeant's examination, Plaintiff was no longer qualified to test for placement on the Sergeant's List.[6]

A few days after being removed from the Sergeant's List, Plaintiff again sought a meeting with City Manager Richard Bowers. (Dkt. 3 at 20). A day later, Plaintiff filed a grievance with Bowers. (Dkt. 3 at 21). Bowers declined to take any action on Plaintiff's grievance. (Ex. E to Dkt. 3).

Plaintiff thereafter contacted Dale Dauten, a nationally syndicated columnist, about writing a column concerning Plaintiff's experience related to the sexual harassment allegation and investigation. After interviewing Plaintiff, Dauten declined to write an article about Plaintiff's experience but referred Plaintiff to the Arizona Republic. Plaintiff was subsequently interviewed and an article published by the Republic. Thereafter, several reports appeared in the media about Plaintiff's experience.

On or about October 29, 1993, or approximately seven months after his removal from the Sergeant's List, Plaintiff published a newsletter entitled "A Time to be Heard." (Ex. F to Dkt. 46). The newsletter stated that its goal was "to provide press awareness and continual press coverage of the Scottsdale Police Department which will expose any wrongdoing or unfair treatment by top staff." (Ex. F to Dkt. 46). Copies of the newsletter were sent to several members of the City Police Department, as well as others, including media outlets. The first newsletter was ostensibly published by an organization entitled "United We Stand" whose stated goal was to identify and eliminate "illegal, immoral, unethical and unfair treatment by high ranking officials within government agencies." (Ex. F to Dkt. 46). This issue stated that although Plaintiff's treatment was the catalyst for the "group," it would expand to other topics and a major focus of that issue was the gathering of supporters. A second issue was published which, while critical of Chief Heidingsfield's predecessor, found the predecessor superior to Heidingsfield. This issue discussed the sexual harassment allegation and investigation in detail. This issue also discussed labor unrest within the Los Angeles Police Department.

In December, 1993, following publication of the second issue of the newsletter, Internal Affairs began another investigation. The investigation concluded in February, 1994, and Plaintiff was placed on paid suspension. Ultimately, the investigators found that Plaintiff had engaged in conduct unbecoming to an employee that tended "to bring discredit to the employee, the department, or the city;" had engaged in conduct tending to disrupt or undermine the efficient operation of the department; and had been abusive in attitude, language or behavior toward a fellow employee or supervisor. (Ex. H to Ex. 1 to Olive Deposition at Dkt. 46). A pretermination hearing was held on March 1, 1994. As a result of that hearing, Plaintiff was terminated on March 2, 1994.

---

**6.** Plaintiff alleges that he was permanently removed from the List; however, Plaintiff's deposition testimony support that placement on the List was good for one year from posting. The only reason the removal in this case could be considered permanent is because the Department increased the educational requirements to qualify for the sergeant's position beginning the year after Plaintiff was placed on the List. Plaintiff stated in deposition testimony that he could not meet those increased requirements.

Plaintiff appealed his termination to the Scottsdale Personnel Board ("the Board"). The Board held a two day evidentiary hearing in late August, 1994. The Board recommended that Plaintiff's termination be upheld on September 1, 1994. City Manager Richard Bowers adopted the recommendation. (Ex. 1 to Olive Deposition at Dkt. 46). Plaintiff was notified of that decision by letter dated September 12, 1994. (Ex. 1 to Olive Deposition at Dkt. 46).

Plaintiff filed this action on May 20, 1994. (Dkt.1). He filed a First Amended Complaint on September 16, 1994. (Dkt.3). Plaintiff alleged violation of his First, Fifth, and Fourteenth Amendment rights. Plaintiff also alleged state law claims for malicious prosecution, grossly negligent investigation and supervision, wrongful termination, defamation, and intentional or negligent infliction of emotional distress.

Defendants have been granted partial judgment on Plaintiff's claims for punitive damages and state law claims for malicious prosecution, grossly negligent investigation and supervision, and negligent infliction of emotional distress. (Dkt. 28 and 88). Pending are Defendants' motions for summary judgment on Plaintiff's federal claims (free speech and due process) and Plaintiff's remaining state law claims (defamation, intentional infliction of emotional distress, and wrongful termination). (Dkt. 44 and 45).

## II. Summary Judgment on Plaintiff's Federal Claims

Defendants seek summary judgment on Plaintiff's claims that his free speech and due process rights under the First, Fifth, and Fourteenth Amendments were violated by the Department's investigations, its findings at the conclusion of those investigations, removal from the Sergeant's List, and his termination.

Summary judgment is appropriate when the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "One of the principal purposes of the summary judgment rules is to isolate and dispose of factually unsupported claims." Celotex Corporation v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The dispute must also be genuine. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. at 249, 106 S.Ct. at 2511. There is no issue for trial unless there is sufficient evidence favoring the non-moving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 249–50, 106 S.Ct. at 2510–11. In a civil case, the question is:

whether a fair-minded [trier of fact] could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

Id. at 252, 106 S.Ct. at 2512.

The moving party who has the burden of proof on the issue at trial must establish all of the essential elements of the claim or defense for the court to find that the moving party is entitled to judgment as a matter of law. Fontenot v. Upjohn, 780 F.2d 1190, 1194 (5th Cir.1986); Calderone v. United States, 799 F.2d 254, 259 (6th Cir.1986). However, the moving party need not disprove matters on which the opponent has the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, summary judgment is proper if the non-moving party fails to make a showing sufficient to establish the existence of an essential element of their case on which they will bear the burden of proof at trial. Id. See also, High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563 (9th Cir.1990) (discussing differing burdens when moving party bears burden of persuasion at trial as compared with a case

where the non-moving party bears the burden of persuasion at trial).

### A. Due Process Claim

Plaintiff alleges that he was deprived of a property interest in promotion to sergeant without due process of law. Plaintiff contends that a property right to promotion was created by mutual understandings created by Chief Heidingsfield's statements in the "Straight Talk" video tape and by the past practice of promoting from the Sergeant's List in ranked order. (Dkt. 3 at 25). Defendants contend that Plaintiff's admissions that Heidingsfield's statements were qualified and that other officers have not been promoted in ranked order from the Sergeant's List establishes that a property interest in promotion did not exist. In the alternative, Defendants argue that Plaintiff's *Loudermill* and post-termination evidentiary hearings provided any process due.

■ The Supreme Court has stated that there can be no deprivation of the right to procedural due process unless a plaintiff has a protected property or liberty interest. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 597–99, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir.1989); *Hewitt v. Grabicki*, 794 F.2d 1373, 1380 (9th Cir.1986). Thus, evaluation of due process claims require two steps. *Hewitt*, 794 F.2d at 1380. First, courts must determine whether a liberty or property interest exists which entitles an individual to due process protection. *Id.* If such an interest is found, then courts must determine what process is due. *Id.*

■ A property interest must arise from an independent source such as state or federal statute, municipal ordinance or charter, an express or implied contract, or a contract implied from policies and practices of a particular institution. *Perry*, 408 U.S. at 601, 92 S.Ct. at 2699 ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing"). *See, Calhoun v. Gaines*, 982 F.2d 1470, 1473–74 (10th Cir. 1992); *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir.1991).[7]

■ Plaintiff contends that statements made by Chief Heidingsfield in the Straight Talk video in conjunction with past practice and custom gave rise to a property interest in promotion to sergeant and/or in his placement on the Sergeant's List. Where a promoting officer can consider factors in addition to an applicant's ranking on an eligibility list, a police officer's expectation of promotion in ranked order based on that list does not rise to the level of a property interest in promotion. *Billish v. City of Chicago*, 962 F.2d 1269, 1299 (7th Cir.1992) (*en banc*); *Stuart v. Roache*, 951 F.2d 446, 455 (1st Cir.1991). *See, Stiesberg v. California*, 80 F.3d 353, 357 (9th Cir.1996) (officer failed to state a claim for deprivation of property or liberty interest arising from transfer where officer did not allege facts supporting that he had a reasonable expectation of entitlement not to be transferred). *Cf., Paskvan v. City of Cleveland Civil Service Commission*, 946 F.2d 1233, 1236 (6th Cir.1991) (plaintiff's theory that City waived its right under ordinance to choose from group of three qualified eligibles by custom and practice of promoting

---

7. A liberty interest may arise under state law or the Constitution. *Browning v. Vernon*, 44 F.3d 818, 821 (9th Cir.1995); *Merritt v. Mackey*, 827 F.2d 1368, 1370 (9th Cir.1987) ("An individual has a liberty interest in employment by the Due Process Clause if the dismissal is 'for reasons that might seriously damage his standing in the community.' quoting *Bollow v. Fed. Res. Bank*, 650 F.2d 1093, 1100 (9th Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982)), or if the dismissal effectively precludes future work in the individual's chosen profession." A liberty interest is implicated " ' [w]here

a person's good name, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' " *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), *quoting Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). To survive summary judgment, a plaintiff must show that he was dismissed for stigmatizing reasons, *i.e.* for moral turpitude, and that he is precluded from future employment in his chosen profession for those reasons. *Merritt*, 827 F.2d at 1373.

based upon test grade rank was sufficient to withstand motion to dismiss).

Plaintiff concedes that prior to the administration of the Sergeant's Examination, Chief Heidingsfield made a public statement on videotape shown to officers announcing the "Rule of Three" under which he reserved the right to interview and select any of the top three candidates from the Sergeant's List for promotion. (Plaintiff's Statement of Facts ¶ 16, Dkt. 50). During his deposition, Plaintiff testified that Chief Heidingsfield stated that he:

> could not think of a reason that he would invoke the Rule of Three and then actually remove somebody from the list.

(Olive Deposition at 110, Dkt. 46). Plaintiff also testified that a candidate's name ordinarily remained on the Sergeant's List for a year.

■ Although Defendants agree that Heidingsfield stated that he "could think of no reason" that he would invoke the Rule of Three and deviate from the ranked list of candidates in the "Straight Talk" videotape, Plaintiff concedes that Heidingsfield specifically and expressly announced his reservation of the right to invoke the Rule. The Court concludes that Heidingsfield's statement that he could not envision the circumstances under which he would invoke the Rule does not raise a genuine issue of material fact that he reserved the right to do so. (Plaintiff's Statement of Facts ¶ 18, Dkt. 50). Heidingsfield's statement was insufficient to give rise to a reasonable expectation that the Rule of Three would not be invoked or that candidates would only be promoted in ranked order. *See, Stiesberg, supra.*

■ Plaintiff also argues that past practice and custom gave rise to a property interest in promotion. Plaintiff conceded at deposition that only three persons had been promoted, in ranked order, after the Rule was announced. Plaintiff also conceded at deposition that while he was the first candidate against whom the Rule was invoked, he is not the only candidate; Randy Stringfellow, a second ranked candidate, was subsequently bypassed in favor of Marcy Miller, a third ranked candidate. The Court concludes that

promotion of three individuals in ranked order is not sufficient to establish a practice or custom of promoting from the Sergeant's List in ranked order, particularly in light of subsequent out-of-rank order promotions, so as to create a property interest in promotion in ranked order.

■ Although the Court has concluded that Plaintiff did not have a property interest in promotion to sergeant, a question exists as to whether he had a property interest in retention on the Sergeant's List such that he could not be removed from the List without notice and an opportunity to respond. Retention on an eligibility list can implicate constitutional property interests. *Stana v. School Dist. of City of Pittsburgh,* 775 F.2d 122, 126 (3d Cir.1985); *Paskvan,* 946 F.2d at 1236.

The plaintiff in *Stana* was a teacher certified by the Pennsylvania Department of Education to teach chemistry and general science, who applied for a teaching position with the Pittsburgh School District. 775 F.2d at 124. Under Pennsylvania law, the superintendent of schools was required to maintain eligibility lists arranged in ranked order and no teacher was to be appointed, promoted, or transferred to a teaching position unless that person was one of the three top ranked candidates on the eligibility list. *Id.* A teacher's name would usually remain on the eligibility list for four years, unless the candidate failed to respond to inquiries regarding their current status. *Id.* Stana became one of the top three candidates on the eligibility list in 1981. *Id.*

In 1982, the assistant director of personnel for the district noted that Stana was teaching at a private high school and contacted that school's principal for his evaluation of Stana. *Id.* The principal stated orally and in writing, but confidentially, that Stana's performance was unsatisfactory. *Id.* The assistant director took no immediate action, but subsequently convened a committee to review Stana's credentials. *Id.* Shortly before convening that meeting, a chemistry position became available in the district. *Id.* At that time only two teachers were on the eligibility list, Stana and another teacher; the director knew that the other teacher was unavailable.

*Id.* Stana was by-passed for the position and the position was advertised and subsequently filled with someone not on the list. *Id.* When Stana contacted the district about the opening, she was told that the position had been filled. *Id.* A month later, Stana was notified in writing that she had been removed from the eligibility list pursuant to a credentials committee re-evaluation. *Id.* At a subsequent meeting, Stana learned for the first time that negative confidential information had been received about her performance at the private school. *Id.* Stana filed suit alleging a denial of procedural due process arising from the failure to provide her with notice and an opportunity to be heard concerning the negative confidential evaluation prior to bypass for the position and removal from the eligibility list. *Id.* at 125.

The Third Circuit held that retention on an eligibility list which was a *sine qua non* for placement in a teaching position implicated a constitutional property interest. *Id.* at 127. The court concluded that the district's policy of placement, ranking, and selection of candidates from an eligibility list and retention of a candidate's name on the eligibility list for a specified period of time constituted a mutually explicit understanding and a policy or rule sufficient to give rise to a property interest in retention on the list. *Id.*

In this case, Plaintiff has asserted that a candidate's name remained on the Sergeant's List for a year and that his name was removed without notice or a meaningful opportunity to oppose removal prior to removal. Plaintiff has also alleged that candidates were only promoted from the List. Defendants have not contested these allegations. Instead, Defendants contend that Plaintiff received any process due with respect to the removal of his name from the Sergeant's List in his subsequent termination proceedings.

■ To determine what process is due, courts must weigh the private interest affected by official action; the risk of erroneous deprivation of that interest through the procedures used; the probable value, if any, of additional or substitute procedural safeguards; and the burden on the Government to provide additional or substitute procedural safeguards. *Zinermon v. Burch,* 494 U.S.

113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990), citing *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and an opportunity to be heard appropriate to the case. *Stana,* 775 F.2d at 127.

■ Defendants contend that Plaintiff's meetings with Chief Heidingsfield and City Manager Bowers prior to the close of the investigation and removal from the Sergeant's List satisfied due process, particularly in conjunction with the pre- and post-termination hearings. Plaintiff contends that his pre- and post-termination hearings were insufficient to cure a lack of due process with respect to his removal from the Sergeant's List. The Court agrees. Plaintiff has presented evidence supporting that he had a significant interest in remaining a candidate on the Sergeant's List; that a significant risk of erroneous deprivation of that interest existed because he could not challenge removal from the List or the finding of sexual harassment; and that the burden on the Government to permit Plaintiff to challenge the finding and removal from the List was relatively small. Accordingly, summary judgment will be denied with respect to Plaintiff's claim that he was denied due process by removal of his name from the Sergeant's List without notice and a meaningful opportunity to be heard. *See,* n. 5.

Plaintiff also contends that he was deprived of due process with respect to his termination. Defendants contend that they are entitled to summary judgment on this claim because Plaintiff has not alleged any deprivation arising from his termination. Plaintiff has not opposed Defendants' contention that he received any process due with respect to his termination. Therefore, Defendants will be granted summary judgment on this portion of his due process claim.

*B. Free Speech*

Plaintiff alleges in his Complaint that he was impermissibly terminated for exercising his First Amendment right to free speech by publishing the two newsletters. Defendants

argue that Plaintiff's newsletters did not constitute speech on matters of public concern entitling them to summary judgment on this claim. (Dkt.44).

In *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983), the Supreme Court held that a public employee's right to free speech under the First Amendment is violated if the employee was penalized for speaking as a citizen upon matters of public concern. *See, Perry v. Sindermann,* 408 U.S. 593, 596, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (plaintiff's lack of a contractual or tenure right to re-employment, taken alone, did not defeat his claim that non-renewal of his contract violated the First and Fourteenth Amendments). Whether the speech is a matter of public concern is determined by the content, form, and context as a whole and requires a balancing of the competing interests at stake. *Myers,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Thereafter, courts must balance the employee's right to speak out on matters of public concern against the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees. *Id.* at 150–52, 103 S.Ct. at 1691–93. An employee's speech on matters not of public concern do not implicate the First Amendment. *Id.* at 147, 103 S.Ct. at 1690.

Plaintiff sent out two "newsletters" after he was removed from the Sergeants' List. The first, denominated "issue O," stated that:

Although this letter will initially deal with many negative aspects of the Scottsdale Police Department, it will quickly expand far beyond that level. While my personal torture and unjust admonishment may be the catalyst that started this company and therefore this letter, the first purpose of United We Stand is to save an ailing police department before it is too late.

(Ex. F to Dkt. 3).

This letter describes its goal as revealing the wrongdoing of top level staff at the Scottsdale Police Department. The letter provided that Department staff would not be charged to receive the newsletter. Donations for publication were sought, with any excess to be placed in a legal defense fund

"to defend [any] officer grievously wronged by the Department." This "issue" requested that recipients inform other interested parties and stated that the newsletter would be distributed to at least a dozen press organizations. A postscript states in part that "Although it begins with [the Scottsdale Police Department] and my story, government corruption and unfair treatment extends into all walks of life." This issue was signed by Plaintiff.

The second issue of the newsletter discusses the Los Angeles police department and a strike for wage increases. (Ex. G to Dkt. 3). That issue then compares Chief Heidingsfield unfavorably to the previous chief, describing Heidingsfield as dishonest and unfair. The newsletter criticizes the "sexual harassment" finding against Plaintiff. This issue also generally excoriates "liberals," and foments action by the public against "unfair disciplinary action" against police officers. (Ex. G to Dkt. 3). Following release of this issue, the Department initiated its second Internal Affairs investigation, which resulted in Plaintiff's termination.

Plaintiff analogizes the circumstances of this case to those in *McKinley v. City of Eloy,* 705 F.2d 1110 (9th Cir.1983). In *McKinley,* a probationary police officer representing the police union, publicly criticized the City of Eloy's decision not to give police officers an annual raise. *Id.* at 1112. The officer was subsequently fired. *Id.* A jury determined that he was fired in retaliation for publicly commenting on an issue of public concern, *i.e.,* the compensation of police officers and the working relationship between the police union and city officials. *Id.* The Ninth Circuit affirmed the denial of a new trial, concluding that the officer's speech did address an issue of public concern. *Id.*

The Ninth Circuit noted that:

Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the per-

formance of governmental agencies. On the other hand, speech that concerns 'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government merits the highest degree of first amendment protection.

*Id.* at 1114 (internal citations omitted).

█ In this case, Plaintiff commented on issues of fairness to police personnel and supervision of the police department, issues which implicate the working relationship between city officials and police officers. Such issues are matters of public concern. *See, McKinley,* at 1114. *See, also, Rankin v. McPherson,* 483 U.S. 378, 386–89, 107 S.Ct. 2891, 2898–99, 97 L.Ed.2d 315 (1987) (comment expressing hope that future assassination attempt on president would be successful constituted comment on public concern in context of conversation addressing the policies of the President's administration); *Fire Fighters Association, District of Columbia v. Barry,* 742 F.Supp. 1182, 1189–90 (D.D.C. 1990) (bumper sticker on fire fighter's personal car stating "D.C. Fire Department— Not Just a Job, Its a Joke, Too!" found to constitute speech on matter of public concern; the effective management of the fire department); *Chico Police Officers' Association v. City of Chico,* 232 Cal.App.3d 635, 283 Cal.Rptr. 610 (1991) (newsletter critical of police chief commented on matters of public concern including "employer-employee relationships, officer safety, the competency of the police force and other matters which are related to the employer's efficient performance of its duties")

█ A question of fact exists as to whether Plaintiff was dismissed for speaking about matters of public concern. Defendants will be denied summary judgment on Plaintiff's First Amendment claim.

### III. Summary Judgment on Plaintiff's State Law Claims

Plaintiff alleges in his Amended Complaint that Defendants' respective roles in the:

initiation, conduct, and adverse finding of sexual harassment against [Plaintiff] based upon alleged sexual harassment claim which did not even meet the City's own

*prima facie* definition for sexual harassment, as well as for their failure to overturn that finding, or cause that finding to be overturned [renders Defendants liable for wrongful termination, defamation, and intentional infliction of emotional distress].

(Dkt.3). Defendants seek summary judgment on these remaining state law claims.

### A. Defamation

Defendants argue that they are entitled to summary judgment on Plaintiff's defamation claim based upon a qualified privilege from liability. Plaintiff argues that Defendants are not entitled to assert a qualified privilege because the finding of sexual harassment failed to meet the *prima facie* requirement for harassment under the City policy, *i.e.*, **unwelcome** conduct of a sexual nature, where the presumptive victim of the harassment affirmatively denied that she was harassed or offended by Plaintiff's e-mail. Defendants reply that Plaintiff has not shown that any allegedly defamatory remark was published by them outside of the Department and that "publication" within the Department is protected.

█ An action for defamation:

compensates *damage to reputation* or good name caused by the publication of false information. *Hill,* 385 U.S. at 384 n. 9, 87 S.Ct. at 540 n. 9; *Reed.* To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty or integrity, virtue, or reputation. *See, Phoenix Newspapers, Inc. v. Choisser,* 82 Ariz. 271, 312 P.2d 150 (1957).

█ *Godbehere v. Phoenix Newspapers, Inc.,* 162 Ariz. 335, 783 P.2d 781, 783 (1989). Under Arizona law, individuals have a conditional privilege to report perceived acts of sexual harassment and are protected from liability for defamation. *Miller v. Servicemaster by Rees,* 174 Ariz. 518, 520, 851 P.2d 143, 145 (App.1993). The privilege extends to the reporter and employer. *Id.* Other states have extended the privilege to individuals who investigate reports of perceived harassment and to supervisors who act on their findings. *Scherer v. Rockwell Int'l Corp.,* 766 F.Supp. 593, 607 (N.D.Ill.1991);

**576**

*Stockley v. AT & T Info. Sys., Inc.,* 687 F.Supp. 764, 769 (E.D.N.Y.1988).

 To determine whether a conditional privilege exists, courts must determine whether the reporter had an obligation to report. *Miller,* 851 P.2d at 145. Thereafter, the plaintiff must prove that the privilege was abused by proving actual malice or demonstrating excessive publication. *Id.* "Actual malice is a question of fact for the factfinder which can be demonstrated by proving a defendant made a statement knowing it was false or with reckless disregard to its truth." *Id.* However, if there is no evidence of actual malice or excessive publication, the court may resolve the issue. *Id.*

 Statements about public officials are conditionally privileged under Arizona law. *Lewis v. Oliver,* 178 Ariz. 330, 335, 873 P.2d 668, 671–72 (App.1993). Police officers are recognized as public officials under Arizona law. *See, Lewis v. Oliver,* 178 Ariz. 330, 335, 873 P.2d 668, 675 (App.1993), citing *Turner v. Devlin,* 174 Ariz. 201, 848 P.2d 286 (1993). As with reports of sexual harassment against a plaintiff, a public official may recover for defamation if a statement about him was made with (1) "actual malice, *i.e.,* with knowledge of its falseness or with reckless disregard of whether it was true or not; or (2) excessive publication, *i.e.,* publication to an unprivileged recipient not reasonably necessary to protect the interest upon which the privilege is grounded." *Id.*

 Scottsdale's harassment policy required employees to report instances of sexual harassment; therefore reports of possible harassing conduct, including Plaintiff's e-mail, and investigation of sexual harassment are conditionally privileged. Statements about Plaintiff were also subject to a qualified privilege because Plaintiff was a police officer and therefore a public official. To overcome either of these privileges Plaintiff must establish that Defendants acted with either actual malice or caused excessive publication.

Plaintiff implies that a finding of sexual harassment which allegedly did not conform, *prima facie,* with the Department's own definition of harassment establishes actual malice. An example of inappropriate conduct identified in Scottsdale's policy was the solicitation of sexual favors; Plaintiff's comment could reasonably be construed as such a solicitation. *See,* n. 4 *supra.* Furthermore, even if Plaintiff's conduct did not meet a *prima facie* definition of sexual harassment under Scottsdale's policy, that alone would not establish a question of fact that Defendants had acted with actual malice. *See, Duffy v. Leading Edge Prods., Inc.,* 44 F.3d 308, 315 (5th Cir.1995) (the definition of sexual harassment has a "vernacular meaning" that encompasses a far broader range of misconduct than would be actionable under Title VII). While Scottsdale's policy included examples of behavior that had been found to constitute sexual harassment, it explicitly stated that those examples were not exhaustive. In any event, Plaintiff would bear the burden of proof of establishing malice by Defendants at trial; he has not presented evidence raising an issue of material fact that Defendants acted maliciously. *See, Duffy, supra.*

 Plaintiff has also failed to show that Defendants engaged in excessive publication of the sexual harassment allegations. Although Plaintiff contends that the sexual harassment allegations were generally known within the Department and that the finding was published in an internal memorandum to the Scottsdale City Manager (Defendant Bowers), such publication does not constitute excessive publication, particularly since Plaintiff himself sought review of the sexual harassment finding from Bowers. *See, Oliver,* 873 P.2d at 671–72. It appears that publication to persons not involved in the investigative or supervisory process was made by Plaintiff, not Defendants; Plaintiff does not allege that any of the Defendants made statements about the allegation or findings to those outside the Department or City review process. *See, Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 289 (8th Cir.1982) (a defamatory statement is not published until it is communicated outside the internal organization). Defendants will be granted summary judgment on this claim.

## B. Intentional Infliction of Emotional Distress

Plaintiff seeks damages for intentional infliction of emotional distress arising from a failure to follow City procedures with respect to sexual harassment allegations and the allegedly improper finding of sexual harassment. Plaintiff also seeks damages for intentional infliction of emotional distress with respect to his termination.

■■■■ To state a claim for intentional infliction of emotional distress under Arizona law, a plaintiff must allege acts which "can be considered ... extreme and outrageous." *Gonzales v. Palo Verde Mental Health,* 162 Ariz. 387, 783 P.2d 833, 836 (App.1989). A plaintiff must also allege that the defendant intentionally caused or recklessly disregarded the near certainty that such distress would occur and actually result from the conduct. *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 619 P.2d 1032, 1035 (1980). The conduct required to support a cause of action for infliction of emotional distress "falls at the very extreme edge of the spectrum of possible conduct." *Id.* To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that conduct of a defendant was "so outrageous in character and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Cluff v. Farmers Ins. Exch.,* 10 Ariz.App. 560, 562, 460 P.2d 666, 668 (1969). *Accord, Mintz v. Bell Atlantic Sys. Leasing,* 183 Ariz. 550, 905 P.2d 559, 562 (App.1995). Such conduct is seldom found in the employment context. *Mintz,* 905 P.2d at 563. "Only when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous does the issue go to the jury." *Id.* at 562. *See, Nelson v. Phoenix Resort Corp.,* 181 Ariz. 188, 199, 888 P.2d 1375, 1386 (App.1994) (calling an employee into work at 3:00 a.m., having armed security take the employee from his office to a lobby where news media were gathered and publicly firing the employee was insufficient to survive the employer's motion for summary judgment on the employee's intentional infliction claim).

Plaintiff compares his circumstances to those in *Ford v. Revlon,* 153 Ariz. 38, 734 P.2d 580 (1987), in which the Arizona Supreme Court permitted a victim of sexual harassment to maintain a cause of action against her employer for repeated failures to follow its own sexual harassment policies, which resulted in serious emotional distress, including depression and attempted suicide. *Ford* is not analogous to this case; *Ford* held that a duty to follow sexual harassment procedures ran to the alleged victims of harassment, not the alleged perpetrators. Furthermore, other courts have not sustained claims for intentional infliction arising from allegedly wrongful allegations of sexual harassment. *Martin v. Baer,* 928 F.2d 1067, 1074 n. 15 (11th Cir.1991) (duty to investigate alleged sexual harassment does not run to the alleged perpetrator). *See, Gonzalez v. CNA Ins. Co.,* 717 F.Supp. 1087, 1089 (E.D.Pa. 1989) (claim that plaintiff's employer falsely accused him of sexually harassing employees "pales in comparison to the cases that have permitted recovery for intentional infliction of emotional distress").

Plaintiff contends that *Martin* and *Gonzalez* are distinguishable in that he was not only accused, but actually found to have violated the City's sexual harassment policy, despite the absence of a complaint from the victim. However, Plaintiff does not identify any procedure which Defendants failed to follow in investigating the circumstances surrounding the e-mail or Plaintiff's conduct; instead, Plaintiff complains of the results of that investigation. The Plaintiff has not presented evidence raising a genuine issue of material fact that Defendants' actions were so outrageous as to preclude summary judgment on this claim.

## C. Wrongful Termination

Plaintiff alleges in his First Amended Complaint that his termination was premised upon the Defendants' "initiation, conduct, and adverse finding of sexual harassment" and their failure to overturn that finding. (Dkt. 3 at 28). Defendants seek summary judgment on this claim because Plaintiff has not alleged facts showing that he was terminated in violation of public policy from an at-

will position. Defendants also seek dismissal of this claim as to any other defendant than the City.

■ At the hearing held on February 15, 1996, Defendants conceded that Plaintiff was not an at-will employee; therefore, Defendants' arguments that Plaintiff's termination does not fall within an exception to the employment at—will doctrine will not be considered. The only other basis asserted by Defendants for summary judgment is that Plaintiff was not terminated based upon the finding of sexual harassment. The parties have not addressed in any detail Plaintiff's rights under the terms of his employment with the City. Furthermore, the parties have not presented evidence substantiating the bases for Plaintiff's termination. The Court is unable to determine from the evidence presented whether Plaintiff was terminated wholly or in part based upon the sexual harassment finding. The Court will therefore deny the motion for summary judgment with respect to Plaintiff's wrongful termination claim; however, the Court will dismiss this claim as to all Defendants except the City.

### IV. Motions in Limine

Defendants have filed a motion in limine to preclude Plaintiff from offering evidence of or inquiring about alleged incidents of sexual harassment by other Scottsdale police officers as irrelevant and prejudicial. (Dkt.78). Defendants point out that Plaintiff refused to identify other employees who may have engaged in the same type of conduct for which he was disciplined during his deposition, even after Defendants explained the relevance of such testimony. Defendants indicate that Plaintiff may seek to elicit testimony from one of its witnesses, Patti Johnson, that another officer (Tom Macari) approached her while on duty and massaged her neck and shoulders, but was never investigated for sexual harassment.

Plaintiff opposes the motion because the trial is to the bench, and therefore, that the risk of unfair prejudice is minimal. Plaintiff also anticipates that Johnson will be called by Defendants to testify about harassing remarks he made to her and which may have factored into the Department's decision to terminate him. Plaintiff contends that since Defendants will be calling Johnson to justify termination of Plaintiff, he should be permitted to attack that justification by showing that Johnson is not a credible witness and that she received special treatment where the Department never investigated her friend, Macari, for sexual harassment.

■ The Court concludes that there is not a likelihood of unfair prejudice during a bench trial if Plaintiff attempts to impeach the testimony of Johnson. The Court will deny the motion in limine, without prejudice to renewal at trial.

Plaintiff has filed a motion in limine to exclude "any and all evidence" relating to an interview which the Department conducted with Officer Marcy Miller on April 19, 1994 and "any and all information gained as a result of that interview." (Dkt.84). Plaintiff seeks to preclude the testimony as irrelevant to Plaintiff's termination, since he was terminated before the events described by Miller in her interview. During the interview, Miller allegedly described a meeting she had with Olive on March 22, 1994, about three weeks after he was terminated.

Defendants oppose the motion contending that Miller's meeting with Olive occurred on March 22, 1993, or nearly a year before he was terminated. (Dkt.86). Defendants further contend that Olive told Miller that he intended to do something that would force the City to fire him and that his primary goal was to have Chief Heidingsfield and City Manager Bowers fired as well. Defendants contend that this evidence is relevant because it took place prior to the Personnel Board hearing concerning the propriety of the termination and was considered by the Board in affirming the termination. Defendants further contend that the evidence is admissible pursuant to *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Plaintiff disputes the applicability of *McKennon* and contends that information considered by the Board on appeal is irrelevant to the reasons for Plaintiff's termination.

In *McKennon,* an employee who had been discharged filed suit alleging that she was illegally discharged because of her age. *Id.* at 354–56, 115 S.Ct. at 883. The employer learned at her deposition that the employee had made copies of confidential financial documents and removed those copies prior to her discharge. *Id.* The employer sent a second letter discharging the employee based upon the illicit removal of documents. *Id.* The Supreme Court held that after-acquired evidence of employee wrong-doing which would have resulted in discharge of the employee did not bar the employee from all relief but was relevant to remedies, namely that it would bar front pay and reinstatement, since the employer would have terminated the employee based on the misconduct. *Id.* at 360–63, 115 S.Ct. at 886. The Court noted that even though employment termination "could not have been motivated by knowledge [the employer] did not have," evidence of misconduct acquired by the employer "after [the employee] had been fired" is admissible to assist the trier of fact in determining "[t]he proper boundaries of remedial relief." *Id.* at 361, 115 S.Ct. at 885.

The circumstances of the instant case are not apposite with those in *McKennon.* There is no allegation that Plaintiff engaged in misconduct which would have resulted in discharge if he had not been fired for some other illegal reason. Instead, the dispute is whether Plaintiff was discharged in violation of his constitutional or statutory rights. The information which Plaintiff seeks to bar is relevant to his motivation in sending out the newsletters; however, his motivation in sending the newsletters is not relevant to the reasons for his termination nor do they constitute misconduct for which he would otherwise have been terminated. Plaintiff's motion in limine will be granted.

The Court being fully advised,

**IT IS ORDERED** denying in part and granting in part Defendants' motion for summary judgment on Plaintiff's federal claims: the motion is denied with respect to Plaintiff's due process claims related to the finding of sexual harassment and removal from the Sergeant's List and Plaintiff's First Amendment claim. The motion is otherwise granted. (Dkt.44).

**IT IS FURTHER ORDERED** denying in part and granting in part Defendants' Motion for Summary Judgment on Plaintiff's Remaining State Law Claims: the motion is denied with respect to Plaintiff's wrongful termination claims against the City of Scottsdale and is otherwise granted as to all other state law claims and Defendants. (Dkt.45).

**IT IS FURTHER ORDERED** denying Defendants' motion in limine (Dkt.78).

**IT IS FURTHER ORDERED** granting Plaintiff's motion in limine to exclude interview with Officer Miller. (Dkt.84).

**IT IS FURTHER ORDERED** that a new trial date and pretrial conference deadlines will be set by separate order.